UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SHERRY ANN FUDGE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 3:16-cv-00804 |
| ) | CHIEF JUDGE CRENSHAW |
| NANCY BERRYHILL,[1] ) | |
| Acting Commissioner of Social Security,, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Pending before the Court is Plaintiff Sherry Ann Fudge's Motion for Judgment on the Administrative Record ("Motion") (Doc. No. 14), filed with a Memorandum in Support (Doc. No. 15). Defendant Commissioner of Social Security ("Commissioner") filed a Response in Opposition to Plaintiff's Motion. (Doc. No. 16.) For the reasons stated herein, the Court denies Plaintiff's Motion (Doc. No. 14).

### I. Introduction

Fudge filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act on July 18, 2012, alleging a disability onset of March 31, 2012. (Tr. 13.) Fudge's claim was denied at the initial and reconsideration stages of state agency review. (Tr. 13.) Fudge subsequently requested *de novo* review of this case by an Administrative Law Judge ("ALJ"). The ALJ heard the case on August 14, 2014, when Fudge appeared with counsel and gave testimony. (Tr. 29–80.) Testimony was also received from an impartial vocational expert.

---

[1] Nancy Berryhill became Acting Commissioner for the Social Security Administration on January 23, 2017.

1

(Tr. 70–79.) At the conclusion of the hearing, the matter was taken under advisement until October 8, 2014, when the ALJ issued a written decision finding Fudge not disabled. (Tr. 10–28.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since March 31, 2012, the alleged onset date (20 C.F.R. 404.1571 *et seq.*).

3. The claimant has the following severe impairments: a mood disorder, an anxiety disorder, obesity, hypothyroidism, lumbago, and hypertension (20 C.F.R. 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, … the claimant has the residual functional capacity to perform medium exertion work as defined in 20 C.F.R. 404.1567(c) except she can only occasionally climb ladders, ropes, or scaffolds, and frequently engage in all other postural activities. She must avoid concentrated exposure to temperature extremes and humidity. As for mental limitations, she can understand, remember, and carry out simple and detailed instructions, but not highly complex instructions. She can complete simple tasks and maintain adequate concentration, persistence and pace on the above tasks throughout an eight-hour workday for periods of two hours at a time with regular or customary work breaks. She can relate appropriately to peers and supervisors, but can have no more than occasionally contact with the general public on a brief and superficial basis. She can adapt to routine workplace changes.

6. The claimant is capable of performing past relevant work as an order filler. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2012, through the date of this decision (20 C.F.R. 404.1520(f)).

(Tr. 15, 17, 22–23.)

On February 22, 2016, the Appeals Council denied Fudge's request for review of the ALJ's decision (Tr. 1–6), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II. Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

> The claimant has a history of hypertension and was a smoker. She complained of chest discomfort in September 2010. On September 1, 2010, treatment notes states that she had worked as a stocker in the past and never had trouble lifting 50 pounds of weight. At that time, she was working as a supervisor. On physical examination, her blood pressure was 134/90 and she weighed 167 pounds. Sunil C. Kaza, M.D. diagnosed the claimant with hypertension, anginal symptoms, ongoing smoking, and hypothyroidism. Dr. Kaza advised the claimant to quit smoking among other recommendations. (Exhibit 2F).
>
> She received medical treatment at Family Healthcare since March 2007. (Exhibit 8F). Donald A. Spisak, DO treated the claimant for low back pain, cervicalgia and hypothyroidism from July 2011 through July 2012. On March 9, 2012, the claimant's blood pressure was 136/82. Her body mass index was 34.5. She was positive for depression with no obvious anxiety or agitation. Dr. Spisak assessed the claimant with depression, hypothyroidism, hypertension, low back pain, and cervicalgia. In June/July 2012, Dr. Spisak's assessment of the claimant included only hypertension, hypothyroidism, anxiety, bipolar disorder and depression, and there were no diagnoses identified for back or neck problems. (Exhibit 7F).
>
> W. Michael Lewis, M.D. and Christopher L. Craft, Family Nurse Practitioner–Board Certified treated the claimant for hypertension, anxiety, and back problems from March 2012 through January 2013. She presented for treatment on the following dates: 8/8/2012, 9/7/2012, 12/11/2012, and 1/11/2013. She presented to Mr. Craft with anxiety and depression worsening, chronic pain due to a motor vehicle collision three to four years ago, muscle spasm, and hypothyroidism on December 11, 2012. Medications were as follows: Amlodipine, Depakote, Dulaera, Flexeril, Hydrocodone-acetaminophen, Imdur, Klonopin, Levothyroxine, Nitroglycerin, Xanax, and Zoloft. On physical examination, her body mass index was 36. On musculoskeletal examination, her gait was coordinated and smooth. Her station was steady. Mood and affect was abnormal as she appeared to be in deep melancholoy [sic], sad, and worrisome. Mr. Craft's assessment of the claimant was anxiety, depression, chronic pain, muscle spasm, hypothyroidism, and anxiety with depression. Upon her return to Dr. Lewis and Mr.

Craft on January 11, 2013, her anxiety and depression had improved. Hypertension was noted to be controlled. However, her low back pain had not changed. She was 63 inches tall and weighed 210 pounds with a body mass index of 37.2. Blood pressure was 132/80. Although she was positive for back pain on review of systems, she exhibited a coordinated and smooth gait that was slow and cautious. Station was steady. She was assessed with essential benign hypertension, anxiety, bipolar disorder, anxiety with depression, depression, and low back pain. Mr. Craft instructed the claimant to follow up in three months. (Exhibit 10F).

In "Case Analyses" dated December 4, 2012 and February 28, 2013, Larry Caldwell, M.D. and Kanika Chaudhuri, M.D., respectively, determined the claimant's impairments of hypertension, obesity, Raynaud's phenomenon, and incontinence were nonsevere based upon treating records up to August 2012 and the claimant's function reports. (Exhibits 1A and 3A).

The claimant presented to Karla McQuain, Ph.D. for a psychological evaluation on November 13, 2012. She reported that she was unable to work because of 'Nerves, Depression; Bipolar; IBS; Incontinence; Hypertension; No mental treatment source.' (Exhibit 9F, p. 1). She stated she had a history of being a 'weekend drunk' in her early thirties, but denied current use of drugs. She reported that prior to caring for her father for the past two years, she cared for her ex-husband who was severely handicapped from a motorcycle accident. She felt like she spent so much time caring for her ex-husband, her father, and working until now that they are all missing from her life, she had become depressed and anxious. (Exhibit 9F).

As for activities of daily living, she could manage her finances and medications with some difficulty. She stated she was able to prepare simple meals, wash dishes, vacuum, sweep, and do laundry, although she had not been performing these chores very often over the last six to eight months because she did not feel like it. She stated her main social support was her friend. She used to care for her horse and sewing, but no longer enjoyed these activities. She was not a part of a church or social organization. The claimant's current Global Assessment of Functioning ("GAF") score was 50-55, indicating moderate difficulty in social and/or occupational functioning. DSM-IV-TR (2000 text revision). In summary, she showed evidence of mild impairment in social relating and in her ability to adapt to change. Dr. McQuain's

4

diagnostic impression of the claimant included anxiety disorder with mixed anxiety and depressive symptoms with some panic attacks, and prior history of alcohol abuse. (Exhibit 9F).

She recently began outpatient mental health treatment at Centerstone Mental Health Facility from December 2013 through June 2014. On January 13, 2014, she presented to Lowell Benson, Jr., MA for individual therapy. She reported dealing with depression and anxiety. She reported a history of mental abuse by her father (who passed away in February 2012) and her second husband. Progress notes state her mood and affect were somewhat depressed with occasional crying spells. She denied any suicidal/homicidal ideations. She reported excessive hours of sleep on March 10, 2014, and 14 hours of sleep on the previous night. She stated she mainly dealt with irritable mood. She described financial stressors and medical issues without health insurance. Her mood and affect was appropriate. (Exhibit 13F, p. 31). The claimant failed to show for her appointments on March 31 and April 2, 2014. Progress notes dated April 7, 2014 state the claimant had been out of Latuda for several days. Her primary care physician had her taking Wellbutrin XL, Effexor, Lortabs, Clonazapam, and Xanax. She stated Latuda was calming for her, which resulted in less anger and irritability. Her mental status examination was unremarkable. (Exhibit 13F, p. 25). Karen D. Kyper, Registered Nurse diagnosed her with major depressive disorder and panic disorder with agoraphobia. (Exhibit 13F).

As of June 2, 2014, her mood and affect was pleasant and stable. Sleep and appetite was described as fair to good. Ms. Kyper intended to discontinue Wellbutrin XL. On mental status examination, her mood was euthymic; affect was blunted. Attention was intact. She had mild impairment in concentration. She denied hallucinations, delusions, or ideations. Memory and judgment were intact, and her insight was good. Her diagnoses remained unchanged and she was noted as stable. (Exhibit 13F, p. 15).

Celine Payne-Gair, Ph.D. completed a Psychiatric Review Technique Form ("PRTF") and functional capacity assessment on November 26, 2012. Dr. Payne-Gair determined the claimant had "mild" limitations with restriction of activities of daily living. However, Dr. Payne-Gair stated the claimant had "moderate" limitations with difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. According to Dr. Payne-Gair, the claimant did not experience any repeated

> episodes of decompensation. (Exhibit 1A, pp. 7–8). In the functional capacity assessment, Dr. Payne-Gair stated the claimant could understand and remember simple and detailed instructions. She could complete simple tasks and maintain attention and concentration for periods of at least two hours, and complete a normal workday and workweek at a consistent pace. Dr. Payne-Gair noted she could relate appropriately to peers and supervisors, and adapt to routine workplace changes. (Exhibit 1A, p. 11). The PRTF and functional capacity assessment by Jenaan Khaleeli, Psy.D. dated February 15, 2013 was identical to the findings by Dr. Payne-Gair. (Exhibit 3A).

(Tr. 18–20.)

### III. Conclusions of Law

### A. Standard of Review

Judicial review of "any final decision of the Commissioner of Social Security made after a hearing" is authorized by section 205(g) of the Social Security Act, which empowers the district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court reviews the final decision of the Commissioner to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision

must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). The agency considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart B of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functioning capacity[.]" Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The agency can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–16; see Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the agency must rebut the claimant's prima facie case by coming forward with proof of the claimant's

individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, at *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the agency must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Plaintiff's Statement of Error

#### 1. *Severe Impairments*

Fudge's first argument is that the ALJ erred by failing to classify her osteoarthritis, Raynaud's syndrome, bilateral carpal tunnel syndrome, residuals from left arm ulnar release surgery, bipolar disorder, and panic disorder with agoraphobia as severe impairments. (Doc. No. 15 at 5–7.) The Court disagrees.

At step two of the sequential evaluation process, "the ALJ must find that the claimant has a severe impairment or impairments" to be disabled. Farris v. Sec'y of Health & Human Servs., 773 F.2d 85, 88 (6th Cir. 1985); see 20 C.F.R. § 404.1520(a)(4)(h). "[A]n impairment is considered 'severe' unless 'the [claimant's] impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities." Winn v. Comm'r of Soc. Sec., 615 F. App'x 315, 324 (6th Cir. 2015) (quoting Soc. Sec. Ruling 85-28, 1985 WL 56856, at *3 (1985)). As such, "the claimant's burden of establishing a 'severe' impairment during the second step of the disability determination process is a '*de minimis* hurdle.'" Id. at 324–25 (quoting Higgs v. Bowen, 880 F.2d 860, 862 (6th Cir. 1988)). "Under [this] prevailing

9

*de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." Id. at 325 (quoting Higgs, 880 F.2d at 862).

"[O]nce any one impairment is found to be severe, the ALJ must consider both severe and nonsevere impairments in the subsequent steps." McGlothin v. Comm'r of Soc. Sec., 299 F. App'x 516, 522 (6th Cir. 2008) (citing Anthony v. Astrue, 266 F. App'x 451, 457 (6th Cir. 2008)); 20 C.F.R. § 416.945(a)(2). Therefore, it is "legally irrelevant" that an impairment was determined to be nonsevere if the ALJ finds other severe impairments. See McGlothin, 299 F. App'x at 522 (reasoning that "because the ALJ found that [plaintiff] has some severe impairments, he proceeded to complete steps three through five of the analysis. It then became 'legally irrelevant' that her other impairments were determined to be not severe.") (quoting Higgs, 880 F.2d at 862). As explained by the Sixth Circuit,

> [a]n ALJ's failure to find a severe impairment where one exists may not constitute reversible error where the ALJ determines that a claimant has at least one other severe impairment and continues with the remaining steps of the disability evaluation. This rule is predicated on the notion that the ALJ "properly could consider claimant's [non-severe impairments] in determining whether claimant retained sufficient residual functional capacity to allow [him] to perform substantial gainful activity."

Winn, 615 F. App'x at 326 (citing Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987)); see also Fisk v. Astrue, 253 F. App'x 580, 583 (6th Cir. 2007) (holding that an ALJ's failure to find an impairment severe at step two is not reversible error if the ALJ "considers all of a claimant's impairments in the remaining steps of the disability determination."); 20 C.F.R. § 404.1523 (stating that when making a disability determination, the Regulations require that if one severe impairment exists, the Commissioner "will consider the

10

combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.").

In the present case, the ALJ found that Fudge had a mood disorder, an anxiety disorder, obesity, hypothyroidism, lumbago, and hypertension impairments during the relevant period. (Tr. 15.) Fudge claims her osteoarthritis, Raynaud's syndrome, bilateral carpal tunnel syndrome, residuals from left arm ulnar release surgery, bipolar disorder, and panic disorder with agoraphobia should also have been found to be severe. Even assuming Fudge is correct, the Court finds that any error in this regard was harmless. The ALJ found six conditions constituted severe impairments and then continued on with the disability analysis. (See Tr. 15.) Thus, Fudge succeeded at step two. Further, the ALJ considered both her severe and nonsevere impairments when determining her RFC, as evidenced by his thorough discussion of her physical and mental medical treatment records. (Tr. 18–20.) The Court also notes that Fudge does not argue which, if any, additional functional limitations would have been supported by the record. Therefore, Fudge's first claim of reversible error fails because it is "legally irrelevant" that the ALJ classified her other impairments as nonsevere.

2. *Obesity*

Fudge contends that the ALJ erred by failing to properly consider her functional limitations as the result of her obesity, as allegedly required by SSR 02-01p. (Doc. No. 15 at 7– 8.) However, her reliance on SSR 02-01p is misplaced. SSR 02-01p explains the Administration's policy on the evaluation of obesity. The ruling serves to "remind adjudicators to consider [obesity's] effects when evaluating disability." SSR 02-01p. According to the Sixth Circuit,

11

> Social Security Ruling 02-01p does not mandate a particular mode of analysis. It only states that obesity, in combination with other impairments "may" increase the severity of other limitations. It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular mode of analysis for obese disability claimants.

Bledsoe v. Barnhart, 165 F. App'x 408, 411–12 (6th Cir. 2006).

Here, the ALJ properly accounted for the effects that obesity has on Fudge's ability to perform medium work. In his RFC analysis, the ALJ stated:

> Further, the undersigned has specifically considered claimant's obesity in accordance with Social Security Ruling 02-1p. The claimant is 63 inches tall and weighs approximately 210 pounds as per testimony and according to Dr. Lewis, a treating source. (Exhibit 10F). Under the National Institutes of Health criteria, this translates to a body mass index of 37.2, which is considered obese. Social Security Ruling 02-1p provides guidance for evaluating claims where obesity is an impairment. The ruling clarifies that obesity can cause limitations of functions such as sitting, standing, walking, lifting, carrying, pushing and pulling. It can also affect postural functions such as climbing, balancing, stooping, and crouching. *The claimant's ability to perform routine movement and necessary physical activity within the work environment has been impaired by her obesity.* The combined effects of her obesity with her other impairments is greater than might be expected without the obesity. *The functional effects of this impairment have been incorporated into the assessed residual functional capacity.*

(Tr. 20 (emphasis added).) The ALJ clearly took Fudge's obesity into consideration when analyzing her functional limitations and incorporated postural limitations into the RFC determination. (Tr. 17.)

Moreover, Fudge has offered no evidence or argument that an additional restriction resulting from her obesity required greater limitations than those already found by the ALJ in his RFC assessment. See Lyons v. Astrue, No. 3:10-cv-502, 2012 WL 529587, at *4 (E.D. Tenn. Feb. 17, 2012) (noting that "plaintiff has not offered any evidence or argument, either in her

objection or her initial motion, that a restriction resulting from her obesity required greater limitations than those found by the ALJ in his RFC determination"). Therefore, the Court finds that the ALJ sufficiently accounted for the impact that Fudge's obesity has on her ability to perform medium work.

3. *RFC Assessment*

Fudge also claims the ALJ erred by failing to include a function-by-function assessment in the RFC assessment as required by 20 C.F.R. § 404.1545, and explained in SSR 96-8p. (Doc. No. 15 at 8–9.) SSR 96-8p states that the ALJ should address a claimant's exertional and nonexertional capacities and also describe how the evidence supports his conclusions. See Delgado v. Comm'r of Soc. Sec., 30 F. App'x 542, 547–48 (6th Cir. 2002) (per curiam); see also Winslow v. Comm'r of Soc. Sec., 566 F. App'x 418, 421 (6th Cir. 2014) (holding "that the ALJ complied with the applicable regulations by assessing each of [the claimant's] work-related limitations that were at issue."); Rudd v. Comm'r of Soc. Sec., 531 F. App'x 719, 729 (6th Cir. 2013) (finding that the ALJ complied with SSR 96-8p because he "fully specified [claimant's] exertional and nonexertional abilities.").

Here, the record reflects that the ALJ complied with the applicable regulations by assessing each of Fudge's work-related limitations that were at issue. Additionally, Fudge asserts that "the ALJ failed to include substantial limitations in the RFC finding correlating to symptoms and limitations which were well-documented in the record." (Doc. No. 15 at 9.) However, she neglects to identify any limitations unaccounted for by the ALJ. See Delgado, 30 F. App'x at 547 (citations omitted) ("[C]ase law does not require the ALJ to discuss those capacities for which no limitation is alleged.") As such, the Court finds that Fudge's third argument also lacks merit.

### *4. GAF Score*

Fudge's final argument is that the ALJ erred by failing to properly consider her GAF score. (Doc. No. 15 at 9–10.) As the ALJ stated, Fudge had a GAF score in the low 50's. (Tr. 19, 468, 492.) A scale of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers). Fudge asserts that the ALJ improperly reduced the severity of her mental health condition based upon her GAF score. This misconstrues the ALJ's stated reasoning. The ALJ merely noted the score in his summary of the medical record. (Tr. 19.) There is also substantial evidence on the record aside from the GAF score that supports the ALJ's mental RFC determination. For instance, the ALJ noted that a majority of Fudge's mental status exams were unremarkable, her diagnoses remained stable, and the ALJ found that during the hearing her "emotions seemed to have been contrived for theatrical effect." (Tr. 21.) Finally, while a GAF score may not be dispositive, the ALJ was permitted to consider it in assessing Fudge's mental RFC. See Konecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 503 n.7 (6th Cir. 2006) ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."). The Court thus finds that Fudge's fourth argument fails.

### IV. Conclusion

For the reasons stated herein, Plaintiff's Motion for Judgment on the Record (Doc. No. 14) will be denied and the decision of the Social Security Administration will be affirmed. An Order will be filed herewith.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE